**STUDENTS CHALLENGING REGULATORY AGENCY PROCEDURES (S. C. R. A. P.), Plaintiff, and Council on Environmental Quality, Involuntary Plaintiff, and Environmental Defense Fund et al., Plaintiffs-Intervenors,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants, and The Aberdeen and Rockfish Railroad Company et al., Defendants-Intervenors.**

**Civ. A. No. 971-72.**

United States District Court,
District of Columbia.

Jan. 9, 1973.

John F. Banzhaf, III, and Peter H. Meyers, Washington, D. C., for plaintiff.

Scott H. Lang and John F. Dienelt, Washington, D. C., for plaintiffs-intervenors.

William M. Cohen, Atty., Dept. of Justice, for defendant United States of America.

Fritz R. Kahn, Gen. Counsel, Arthur J. Cerra, Deputy Gen. Counsel, Betty Jo Christian, Associate Gen. Counsel, and James F. Tao, Atty., I. C. C., for defendant I. C. C.

Hugh B. Cox, Charles A. Horsky, Michael Boudin and James L. Tapley, Washington, D. C., Edward A. Kaier, Philadelphia, Pa., T. A. Miller, San Francisco, Cal., and Albert B. Russ, Jr., Richmond, Va., for defendants-intervenors.

Before J. SKELLY WRIGHT, Circuit Judge, and RICHEY and FLANNERY, District Judges.

PER CURIAM:

This case is again before this court on a motion for a preliminary injunction filed by plaintiff Students Challenging Regulatory Agency Procedures (SCRAP).[1]  In order to understand the

---

1. We reserve for future consideration the following motions of plaintiffs-intervenors Environmental Defense Fund, National Parks & Conservation Association, and Izaak Walton League: motion for leave to file an amended and supplemental complaint; motion for modification of the preliminary injunction and clarification of the court's jurisdiction; and motion for expedited hearing.  The motion of SCRAP for an expedited hearing is dismissed as moot.

Because of our familiarity with this case and by authority of Rule 9(f) of this court, we decide this motion for preliminary injunction on the pleadings and the briefs of counsel for the parties.

present posture of the case, the reasons advanced by plaintiff in support of its motion, and our reasons for denial thereof, a review of the history of this case will be helpful. We summarize only briefly the history prior to our earlier decision, and refer the reader to that decision for a fuller statement of the facts. *See* S. C. R. A. P. v. United States, D. D.C., 346 F.Supp. 189 (1972).

I

In December 1971, in response to petitions from the nation's railroads, the Interstate Commerce Commission entered upon an investigation into the adequacy of rail freight rates, in a proceeding hereinafter referred to as Ex Parte No. 281. *See* Increased Freight Rates and Charges, 1972, 340 I.C.C. 358 (1971). On January 5, 1972, the railroads filed a tariff with the Commission providing for a surcharge of 2.5 per cent on all freight rates, to become effective on February 5. By order dated February 1 the Commission allowed the surcharge to go into effect without suspension, provided the railroads agreed, as they did, that the surcharge would terminate no later than June 5, 1972. Subsequently, on March 17, the railroads filed tariffs providing for selective permanent freight rate increases ranging from 0 to 10 per cent, averaging 4 per cent, which would go into effect on May 1, 1972 and would, at that time, supplant the 2.5 per cent temporary surcharge. As it is authorized to do under the Interstate Commerce Act, the Commission, on April 24, suspended the filed rate increases for the statutory seven-month period until November 30, 1972, and continued its investigation in Ex Parte No. 281. It also extended the 2.5 per cent surcharge until the end of the suspension period.

SCRAP then brought this action to enjoin enforcement of the Commission's February 1 and April 24 orders. In particular, plaintiff alleged that approval of the 2.5 per cent surcharge constituted major federal action significantly affecting the quality of the human environment which violated the National Environmental Policy Act (NEPA), 42 U. S.C. § 4321 *et seq.* (1970), since it had not been preceded by an environmental impact statement. The Commission responded by challenging the standing of SCRAP and the jurisdiction of this court. On the merits, counsel for the Commission conceded at oral argument that an environmental impact statement would have to be issued before the permanent selective rate increases could go into effect. Indeed, the court was informed that the Commission was then in the process of preparing an impact statement for the permanent rate increase. The Commission maintained, however, that no impact statement was necessary for the temporary surcharge as it believed that approval of the surcharge was not major federal action significantly affecting the environment.

Our analysis led us to the conclusion that plaintiff had alleged sufficient concrete interest to obtain standing under the standards established in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Jurisdiction was found under both NEPA and the Interstate Commerce Act. We concluded that we were not reviewing the mere failure of the Commission to suspend carrier-made rates, but rather "an *order* [of the Commission] in which it explicitly found that 'the increases here proposed are just and reasonable,'" and in which the Commission imposed several significant conditions on approval of the rates without suspension. S. C. R. A. P. v. United States, *supra*, 346 F.Supp. at 196–197. (Emphasis in original.) We therefore reached the merits and held that, even though the surcharge was temporary, it nevertheless was major federal action significantly affecting the environment. Having concluded that the Commission had violated NEPA by not issuing an impact statement prior to approving the surcharge, we then considered the propriety of injunctive relief. Plaintiff requested a preliminary injunction against the entire 2.5 per cent surcharge until an adequate impact statement was prepared, and also asked

that we enjoin the Commission from approving the permanent selective rate increase until the Commission issued an adequate statement for that increase.

For the reasons stated in our earlier opinion in this case, we granted a preliminary injunction against the surcharge only as it applied to recyclable goods. With respect to the permanent selective rate increase, since the Commission had not yet issued its final order approving this increase, and since, as noted above, we had been informed by counsel that the Commission was preparing an environmental impact statement covering this increase, we held that the issue was not then ripe for review. We retained jurisdiction, however, to ensure that the Commission would comply with NEPA and with applicable Council on Environmental Quality (CEQ) Guidelines.

■ The railroads and the Commission then sought a stay of our preliminary injunction pending appeal to the Supreme Court of the United States. In its application for a stay to the Chief Justice, acting as Circuit Justice for the District of Columbia Circuit, the Commission again expressly stated that it was then preparing, and would issue, a final environmental impact statement to accompany its approval of the selective rate increase. The Chief Justice, relying on this promise, stated in his opinion denying the stay: "The Commission's study of the proposed selective rate increase is still in progress and *will include an environmental impact statement.*" Aberdeen & Rockfish R. Co. v. S. C. R. A. P., 409 U.S. 1207, 1212, 93 S. Ct. 1, 4, 34 L.Ed.2d 21 (1972) (Burger, Circuit Justice). (Emphasis added.) The railroads and the Commission then

appealed the decision and order of this court,[2] and on December 18, 1972 the Supreme Court noted probable jurisdiction and advanced the case on the Court's calendar. *See,* 409 U.S. 1073, 93 S.Ct. 683, 34 L.Ed.2d 662 (1972).

In the meantime, on October 4, 1972 the Commission issued its final report and order in Ex Parte No. 281, approving with some exceptions the increased tariff filed by the railroads. *See* Increased Freight Rates and Charges, 1972, 341 I.C.C. 290 (1972). Pursuant to the order and the tariff the railroads filed reflecting the order, the selective increases were to take effect on October 23, 1972, at which time they would supplant the 2.5 per cent surcharge which was the object of our earlier injunction, with the exception that the effective date for the rate increases on goods being shipped for purposes of recycling was delayed until November 12, 1972, to permit interested persons to submit their views concerning environmental aspects of the case. *Id.* at 328.

Contrary to its representations to this court and to the Chief Justice that it was preparing an environmental impact statement for its approval of the permanent selective rate increase, the Commission failed to prepare any environmental impact statement to accompany its final report and order. The order, though containing some discussion of environmental issues, simply stated that the rate increase would not significantly affect the quality of the human environment and concluded that an extensive formal environmental impact statement was not necessary. *See id.* at 314.

The Commission immediately received protesting petitions from plaintiff, two federal agencies, and other interested

2. Defendant United States claims we have no jurisdiction to rule on the present motion, citing the settled rule that filing of an appeal vests jurisdiction over the cause of action in the appellate court and denies the lower court jurisdiction to take any further action in the case. This rule, however, is subject to well recognized exceptions, including the principle that an appeal from a lower court order granting a preliminary injunction does not divest the lower court of jurisdiction. *See* Janousek v. Doyle, 8 Cir., 313 F.2d 916, 920–921 (1963) ; Phelan v. Taitano, 9 Cir., 233 F.2d 117, 119 (1956). *Cf.* Ex parte National Enameling & Stamping Co., 201 U.S. 156, 162, 26 S.Ct. 404, 50 L.Ed. 707 (1906). *See also* Rule 62(c), Fed.R.Civ.P.

parties. The Environmental Protection Agency (EPA) stated its regret that the Commission chose not to submit a formal impact statement, arguing that "the historical data presented by the Commission does not support the conclusion that * * * there will be no adverse environmental impact." CEQ, in its letter to the Commission, felt that the conclusion that the October 4 order would have no significant environmental impact "seems unresponsive to the language of our NEPA guidelines * * *."

On November 7, 1972, before the newly approved rates had gone into effect for goods being shipped for purposes of recycling, but after the new rates took effect for all other goods, SCRAP filed the present motion for a preliminary injunction. SCRAP submits that the Commission's October 4 order is invalid under NEPA and asks that, pending a final hearing and determination of this action, we preliminarily restrain the Commission from permitting, and the railroads from collecting, the rate increases referred to in the Commission's October 4 final report and order.

On the very same day that plaintiff filed this motion, the Commission responded to the above mentioned petitions. In an order served on November 8, the Commission suspended, until June 10, 1973, the newly approved tariffs in Ex Parte No. 281 as they applied to goods being shipped for purposes of recycling and reopened Ex Parte No. 281 for "the limited purpose of further evaluating, in accordance with [NEPA], the environmental effects of increased railroad freight rates and charges on the movements of commodities being transported for the purpose of recycling * * *." Under the terms of the Commission's final report and order and the tariffs filed by the railroads in response thereto, the temporary 2.5 per cent surcharge on goods shipped for recycling purposes was scheduled to terminate on November 12, 1972. In its November 8 order, however, the Commission reinstated the temporary surcharge until the end of the new suspension period—that is, until June 9, 1973—but at the same time expressly recognized that our July 10, 1972 decision had enjoined the railroads from collecting the surcharge on goods being shipped for purposes of recycling.[3]

We requested SCRAP to file a memorandum concerning the effect of the Commission's November 8 order on the issues raised in its motion for a preliminary injunction. In its memorandum, SCRAP notes that as to all goods other than those being shipped for purposes of recycling, the selective rate increase approved in the Commission's final report and order was not affected by the Commission's November 8 order. These increases went into effect on October 23, 1972 and are presently being collected by the railroads, SCRAP argues that the Commission's approval of the increase as to these goods, though not hindering recycling as does an increase in rates for goods being shipped for recycling, nevertheless constitutes major federal action significantly affecting the environment since increased railroad freight rates will lead some shippers to divert cargo to other, cheaper, means of transport, particularly to trucks, which cause greater pollution and degradation of the environment than rail transport. As to the Commission's November 8 order suspending its October 4 final order as applied to goods being shipped for recycling purposes and reinstating the temporary surcharge subject to our earlier injunction, SCRAP argues that this action represents an attempt by the Commission, in violation of Section 15(7) of the Interstate Commerce Act, 49 U.S.C.

---

3. The Nov. 8 order reads in part: "*It is further ordered,* That with respect to commodities whose new rates and charges are suspended by this order, the expiration dates of the Tariff of Emergency Charges * * * be, and they are hereby, extended to and including June 9, 1973, subject to the preliminary injunction issued on July 10, 1972, by the United States District Court for the District of Columbia in Civil Action No. 971–72, S.C.R.A.P. v. United States, et al."

§ 15(7) (1970), to extend our previous injunction and thus keep it from becoming moot before the Supreme Court of the United States. As SCRAP notes, our preliminary injunction was scheduled to expire along with the temporary surcharge at the end of the first seven-month suspension period, and it is alleged that the Commission sought to avoid that result by continuing the suspension of the permanent selective rate increase beyond the statutory seven-month limit, reinstating the expired 2.5 per cent temporary surcharge, and purporting to subject the reinstated surcharge to our earlier injunction.

## II

Without speculating as to the Commission's motives for its most recent suspension order, we have concluded, for reasons discussed in the following sections, that it would be inappropriate to grant any further equitable relief at the present time.

A. *Rate increases on goods being shipped for purposes of recycling.*

■ As indicated in the factual summary, the permanent increase in rates for goods being shipped for recycling purposes was suspended in the Commission's November 8 order. Although the Commission reinstated in that order the 2.5 per cent temporary surcharge for these goods, it also expressly stated that the order was subject to our previously issued but expiring injunction which barred collection of the temporary sur-

charge for shipments of these goods. Neither the temporary surcharge nor the permanent increase is presently being collected by the railroads on goods shipped for purposes of recycling, and shippers are paying the same freight rates today on these goods as they paid prior to commencement of Ex Parte No. 281.

■ In view of these facts, we do not think it necessary to issue any further equitable relief with respect to these goods. No harm to plaintiff could be remedied by an injunction, since no burden is now being placed on recycling as a result of anything done in the Ex Parte No. 281 proceeding on review before this court. The purpose of equitable relief is to remedy, not to chastise, and there being no injury to remedy in this aspect of the case at the present time, we decline to issue further injunctive relief.

We are aware, of course, that the Commission's November 8 order, which grants a second seven-month suspension of the tariff filed by the railroads so far as that tariff concerns goods being shipped for recycling purposes and which purports to extend the preliminary injunction of this court during that time, raises serious questions as to its validity under both Section 15(7) of the Interstate Commerce Act[4] and Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).[5] These matters, however, are presently before the Supreme Court of

---

4. "Whenever there shall be filed with the Commission any schedule stating a new * * * rate, * * * the Commission * * * may from time to time suspend the operation of such schedule and defer the use of such rate * * *, but not for a longer period than seven months beyond the time when it would otherwise go into effect * * *. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate * * * shall go into effect at the end of such period * * *."
49 U.S.C. § 15(7) (1970). Although the second 7-month suspension appears to violate this provision, the railroad respondents in Ex Parte No. 281 sent a letter

to the Commission in which they "consent to and acquiesce in the Commission's order served November 8, 1972," but expressly state that this consent "is without prejudice to any position that the railroad respondents may take on the scope of the Commission's authority under Section 15 (7) of the Interstate Commerce Act in relation to other orders in this or other proceedings."

5. " 'Congress, in its wisdom, has fixed seven months as the maximum period of suspension. It seems clear to us that if the courts extend that period, they are in effect amending the statute and that is a matter beyond their power.' " 372 U.S. at 662, 83 S.Ct. at 986, *quoting* 5 Cir., 308 F.2d 181, 186 (1962).

the United States in its review of our preliminary injunction, and we accordingly take no action with respect thereto.

#### B. *Rate increases on all other goods.*

■ The permanent rate increases approved by the Commission's final report and order in Ex Parte No. 281 are now effective and are being collected on shipments of all goods other than those being shipped for recycling purposes. Although it is conceded that no final environmental impact statement was issued with respect to the Commission's approval of this rate increase, we believe that plaintiff has not satisfied the requirements for a preliminary injunction. The standards for granting preliminary equitable relief are set out in Virginia Petroleum Jobbers Assn v. FPC, 104 U. S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958). Application of these guidelines leads us to conclude that, rather than issue preliminary injunctive relief, we should allow this case to proceed to the merits to determine whether the Commission, in approving permanent rate increases for shipments of goods for purposes other than recycling, undertook major federal action significantly affecting the quality of the human environment which should have been preceded by an environmental impact statement under NEPA.

At the outset, the likelihood of success on the merits is not so obvious as to warrant preliminary equitable relief. Plaintiff alleges that an increase in railroad freight rates causes shippers to divert their cargoes to other, cheaper, modes of transport such as trucks. It is also alleged, and defendants concede, that these other modes cause more pollution and consume more scarce energy resources than rail transport. All parties also agree that historically there has been a trend away from rail transport toward truck transport. Defendants contend, however, that increased freight rates play a minimal role in this diversion, and they present several plausible counter-arguments. According to the railroads, the most significant factor causing shippers to shift from rail to truck transport is service deficiencies. They argue that to bar a rate increase would force the railroads to reduce current operating expenditures such as maintenance of structures and equipment, which would entail further reductions in the quality of service and further diversion to truck transport. A rate increase, according to the railroads, will not hurt but will help the environment by giving the railroads the revenue they need to provide better service. More fundamentally, the railroads draw our attention to the obvious fact that it is in their own self interest to request and implement rate increases only where there is no reasonable prospect of diversion to other means of transport. The railroads have as much interest in minimizing diversion as does plaintiff. We also note that, although EPA and CEQ have both strongly criticized the Commission for not considering the environmental effects of increased freight rates on goods being shipped for recycling purposes, neither agency has challenged the Commission's conclusion that increased rates for other goods will not significantly affect the environment. As we stated in our earlier opinion, "The main purpose of an impact statement is to force assessment of the environmental impact of a proposed action. Therefore, a statement is required whenever the action *arguably* will have an adverse environmental impact." S. C.R.A.P. v. United States, *supra*, 346 F. Supp. at 201. (Emphasis in original.) In this case, however, the danger of an adverse impact appears to be sufficiently speculative, at least on the record we now confront, that it would be unsound to grant preliminary relief. Of course, plaintiff will be given full opportunity to demonstrate on the merits that there is indeed a significant adverse environmental impact and that a NEPA statement was required.

Our decision to deny preliminary relief is also influenced by the substantial and irreparable harm to the nation's

railroads that such relief would cause. The record indicates that many railroads are in dire financial straits—some on the verge of bankruptcy—and badly need the revenues now being obtained under the Commission's rate increase. The increase amounts to some $340 million per year, and were this revenue flow halted it could not easily be recouped should it later appear that no NEPA statement was necessary.

Finally, plaintiff waited until November 7 to attack the legality of a rate increase which was approved on October 4 and went into effect on October 23. It is plaintiff who now seeks to upset the *status quo* through a preliminary injunction, and it is reasonable that we impose a higher standard for that relief where, as here, the plaintiff had an opportunity to request an injunction to preserve the *status quo* prior to the time the increase went into effect. The pleadings in this case do not meet this higher standard, and accordingly the motion for a preliminary injunction is denied.